ROUGH DRAFT        NOT A CERTIFIED COPY        ROUGH DRAFT

1       IMPORTANT INFORMATION!   IMPORTANT INFORMATION!   `Exhibit 2`

2

3       It is understood by all attorneys and/or their staff using, saving onto a hard computer disk, or receiving a
4  Livenote/Realtime ASCII or e-mailed rough draft transcript that:
5
        1.  The following is an unedited rough draft
6  transcript.  Various corrections and/or changes my be made before the final version is complete.  The use of this rough
7  draft transcript is limited by C.C.P. 2025.540 (b).  This reporter, as well as any affiliated court reporting agency,
8  will not be responsible for any variance of this draft from the final transcript.
9
        2.  Because of the nature of stenographic outlines,
10 differences WILL exist between the Livenote/Realtime rough draft copy and the certified transcript prepared by the
11 reporter.  Those differences will include the following, among others:
12
                A.   Words may change;
13              B.   Page and line numbers may change;
                C.   Punctuation may change; and/or
14              D.   Quotes my change.

15      3. Providing a Livenote/Realtime ASCII and/or
   e-mail or saving Livenote/Realtime onto a computer hard drive
16 will only be provided when a certified copy is purchased and there will be a charge for the Livenote/Realtime rough
17 transcript in addition to the charge for the certified copy.

18

19 BY MS. CISNEY:

20      Q.  Ms. Valmores, can you state your full name for the

21 record?

22      A.  Elina Valmores.

23      Q.  And what's the address of your current place of

24 employment?

25      A.  6001 Bollinger Canyon Road, San Ramon, California

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

 1  94583, I believe.
 2       Q.  Are you an employee for Chevron?
 3       A.  Yes.
 4       Q.  How long have you worked for Chevron?
 5       A.  Five years.
 6       Q.  What is your current job title?
 7       A.  Information management analyst.
 8       Q.  Have you had that job title the entire time you've
 9  worked for Chevron?
10       A.  Not the entire time.
11       Q.  What job title did you have before?
12       A.  Used to be information analyst, information
13  specialist.
14       Q.  Are those all within the same department?
15       A.  Yes.
16       Q.  They just -- the change just represents promotions?
17       A.  Yes.
18       Q.  What is the description of your job as an information
19  management analyst?
20       A.  I'm the records coordinator for the health and
21  product stewardship group, and I'm also the department
22  librarian.
23       Q.  And that's the department librarian for the
24  information management group?
25       A.  No, the Department of Health, Environment, and

1  Safety.

2     Q.  What type of documents do they store in that library?

3     A.  Could you clarify that question?

4     Q.  In the library for the department of --

5     A.  In the library, we have journals on epidemiology,

6  toxicology; we have reference books; that type of material is

7  in the library.

8     Q.  Is there a catalog for the library?

9     A.  Yes, there is a catalog for the library.

10    Q.  Is there an electronic catalog that can be searched?

11    A.  Yes.

12    Q.  When you searched in this case, did you use the

13  electronic catalog to search?

14    A.  Are we referring to library or referring to records

15  here?

16        MR. ANDING:  I think she's --

17  BY MS. CISNEY:

18    Q.  I'm just asking about the library right now.

19    A.  Okay.  No; no, I did not search the library catalog.

20    Q.  Okay.  You said you did not?

21    A.  I did not.

22    Q.  Can you give me just an overview of what you did

23  search for in regards to documents for this case?

24    A.  I searched our database for records.

25    Q.  That's the electronic database?

1     A.  Yes, I searched an electronic database.

2     Q.  What search terms did you use?

3     A.  I used search terms that legal provided to me.

4     Q.  And would you tell me what those search terms were?

5     A.  I can't recall off the top of my head.

6     Q.  What type of documents are in the database that you
7  searched?

8     A.  There are toxicology studies, health risk
9  assessments, industrial hygiene-type files, safety files.

10    Q.  Would that include published toxicology studies?

11    A.  Yes.

12    Q.  Would it also include unpublished internal Chevron
13 studies?

14    A.  Yes.

15    Q.  If you would go to -- first just so we have it on the
16 record, I'm going to be referencing the exhibits that were
17 attached to the Michael Formoso's deposition.  Rather than
18 trying to attach them to two depositions, we're just going to
19 reference the ones from the other deposition, as long as
20 there's no objection to that.

21        MR. ANDING:  No objection.

22 BY MS. CISNEY:

23    Q.  If you would go to Tab 2, and look at the document,
24 the subpoena.  Have you seen this document before?

25    A.  No.

1    Q.  If you go to the back of the document section -- it's
2 not marked, but page 12.  It's the one after 11 -- there's a
3 database listing, take a look at that document.
4    A.  Okay.
5    Q.  Have you seen this listing before?
6    A.  Yes.
7    Q.  Were you asked to search for these documents?
8    A.  No.
9    Q.  Have you searched for documents?
10   A.  I'm not sure if I searched for these specific
11 documents in the past.
12   Q.  Did you search for these specific documents in this
13 case?
14       MR. ANDING:  Amber, let me object.  I think she's
15 testified that she was provided search terms, so she may not
16 know whether or not those were the specific documents she was
17 searching for, if the terms were formulated by someone else.
18 But if she can answer.  I will allow her to.
19       THE WITNESS:  No, I'm not understanding the question.
20       MR. ANDING:  Do you know if you specifically searched
21 for those documents?
22       THE WITNESS:  No, I don't know.
23       MR. ANDING:  Did you hear her, Amber?
24       MS. CISNEY:  I did.
25       MR. ANDING:  Go ahead.  I wanted to make sure there

ROUGH DRAFT            NOT A CERTIFIED COPY            ROUGH DRAFT

1  wasn't a delay on the phone.

2  BY MS. CISNEY:

3       Q.  Each of these documents have a title, and they have a
4  unique identifier number on the left-hand side.  Were you
5  asked to search either for that identifier number or for the
6  document title as described?

7       A.  Could you clarify what you mean exactly?

8       Q.  Maybe another way to ask:  Were you asked to search
9  for anything other than specific search terms?

10      A.  No.

11      Q.  I'm trying to find out whether you were asked to
12 search simply generic terms, or whether you were asked to
13 identify specific documents that are on this list?

14      A.  I'm not understanding the question.

15          MR. ANDING:  Let me try.  Did legal specifically give
16 you the titles to those documents to search for, or was your
17 search limited only to terms that legal provided to you, is
18 what she's asking, I believe.

19          MS. CISNEY:  Yes; that's correct.

20          THE WITNESS:  Legal provided terms for me to search
21 for.

22          MR. ANDING:  Do you know if those terms included the
23 identifying numbers next to those documents?

24          THE WITNESS:  No.

25 BY MS. CISNEY:

1    Q.   No, they didn't; or no, you don't know?

2    A.   No, I wasn't given identifying numbers to search for.

3    Q.   The database that you're searching, does it have

4 identifying numbers of this type in it?

5    A.   Yes.

6    Q.   And are they in an index system within the database?

7    A.   Could you clarify what you mean by "index"?

8    Q.   What are the numbers used for?

9    A.   The numbers are used as unique identifiers for every

10 record.

11   Q.   So you would be able to search your database and for

12 the documents that are identified by the numbers on this

13 printout that we have?

14   A.   Yes.

15   Q.   Okay.  You were not asked to do so, correct?

16   A.   Correct.

17   Q.   Were you asked to search for the search term benzene?

18   A.   Yes.

19   Q.   Did you find any documents responsive that were prior

20 to 1983?

21   A.   I'm not certain on that.

22   Q.   When were you asked to do these searches?

23   A.   Which search are you referring to?

24   Q.   When you were asked to search for documents in this

25 case, what month were you asked to do them?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1            MR. ANDING:  Amber, I think -- well, let me try to
2 help.  When was the first time you were asked to do a search
3 for documents in this case, if there's more than one?
4            THE WITNESS:  Last year.
5 BY MS. CISNEY:
6      Q.  What date last year?  What month?  I mean, I realize
7 you might not remember the specific date.
8      A.  I don't recall what -- which specific month.
9      Q.  Was it close to the end of the year?
10     A.  Yes.
11     Q.  Did you search for documents, any time that you can
12 recall, prior to, say, Thanksgiving?
13     A.  I'm not certain.
14     Q.  Were you given any documents for guidance such as the
15 request for production of documents or the interrogatories
16 that were sent by the Plaintiff?
17     A.  No.
18     Q.  Okay.  The only guidance you received was the search
19 terms that you received internally, correct?
20     A.  Correct.
21     Q.  Did you first produce documents internally in
22 response to search terms at the end of the year?
23     A.  I don't recall producing documents last year.
24     Q.  Did you find any documents responsive to your search
25 terms?

1      A.   I don't recall producing documents for -- I'm not
2 sure.
3      Q.   Do you remember providing any documents?
4      A.   I'm not certain.
5           MR. ANDING:  At any time, or are you asking about --
6           THE WITNESS:  This year -- are you talking about last
7 year?  This year?
8 BY MS. CISNEY:
9      Q.   Any time.
10     A.   At any time, I have produced documents.
11     Q.   Do you know approximately when that was?
12     A.   That would be January of this year.
13     Q.   Can you tell me a rough description of what you
14 produced?  I mean, the amount of documents or anything like
15 that, categories?
16     A.   I don't recall the amount of documents.  I recall
17 there were journal articles, maybe presentations.  I don't
18 read the documents.
19     Q.   Okay.  Were any of these documents for time periods
20 prior to 1983?
21     A.   I don't recall the dates.
22     Q.   Were they after 1983?
23     A.   They might have been after 1983.
24     Q.   You weren't asked to restrict your searches to -- by
25 the year?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1    A.   No, I was not.

2    Q.   So your searches involved anything that Chevron would
3 have had anywhere in the history?

4    A.   Correct.

5    Q.   And did you send copies of everything, or did you
6 just send a printout of your search results or both?

7    A.   I gave copies to legal of all the records that I
8 found.

9    Q.   Did you save or print a copy of your search results?

10   A.   I gave my search results to legal.

11   Q.   The library you had referenced earlier, is that
12 something that would have possibly been referenced as a
13 toxicology library?

14   A.   I'm not certain in the past what they called it.

15   Q.   Do you know the approximate age the documents --
16 like, from what point do those documents start?

17   A.   In the library?

18   Q.   Yes.

19   A.   I'm not certain.

20   Q.   You didn't search the library itself for any
21 documents in response to this case; is that correct?

22   A.   Correct, I did not.

23   Q.   Were you specifically asked to search only the
24 database?

25   A.   Yes.

ROUGH DRAFT           NOT A CERTIFIED COPY           ROUGH DRAFT

1    Q.  Did you search your database for Material Information

2 Bulletins for Naphtha?

3    A.  Yes.

4    Q.  Did you find any?

5    A.  Yes.

6    Q.  Do you recall what years those were for?

7    A.  No, I'm not certain on the date range.

8    Q.  Did you search for Material Information Bulletins for

9 Fuel Oil?

10   A.  Yes.

11   Q.  Did you find any?

12   A.  Yes.

13   Q.  Did you search for Material Information Bulletins for

14 Toluene?

15   A.  Yes.

16   Q.  Did you find any?

17   A.  Yes.

18   Q.  Did you search for Material Information Bulletins for

19 Xylene?

20   A.  Yes.

21   Q.  Did you find any?

22   A.  Yes.

23   Q.  Did you search for Material Information Bulletins for

24 Crude Oil?

25   A.  Yes.

 1    Q.  Did you find any?

 2    A.  Yes.

 3    Q.  Did you search for Material Information Bulletins for
 4 gasoline?

 5    A.  Yes.

 6    Q.  Did you find any?

 7    A.  Yes.

 8    Q.  Did you search for Material Safety Data Sheets for
 9 any of those chemicals we just listed?

10    A.  Yes.

11    Q.  Did you find any?

12    A.  Yes.

13    Q.  For all of those subjects?

14    A.  I'm not certain.

15    Q.  Do you recall whether you found any for Crude Oil?

16    A.  I don't recall.

17    Q.  All right.  Did you find any for Toluene?

18    A.  Are you referring to MSDSs or MIBs?

19    Q.  MSDS.

20    A.  I can't recall if it's -- whether it's MIB or MSDS.

21    Q.  Okay.  Fuel Oil, do you recall whether you found any
22 MSDSs for Fuel Oil?

23    A.  I can't recall that one specifically.

24    Q.  Crude Oil, did you find any MSDSs for Crude Oil?

25    A.  I can't recall that one specifically either.

1      Q.  Do you know if there's anywhere else within this

2  company that Material Information Bulletins would have been

3  stored?

4      A.  Not that I'm aware of.

5      Q.  Do you know if there's anywhere else in the company

6  that Material Safety Data Sheets would be stored?

7      A.  Not that I'm aware of.

8      Q.  Would either of those be found -- either the MSDSs or

9  the Material Information Bulletins be found in the physical

10 library?

11     A.  Not that I'm aware of, no.

12     Q.  Would the database you searched contain safety

13 training manuals?

14     A.  That's possible.

15     Q.  Did you search for those?

16     A.  I'm not certain if that's what legal asked me.

17     Q.  Do you have any record of the search terms that you

18 used?

19     A.  I don't keep those records.

20     Q.  Go to Tab 1, if you would, please.

21     A.  Okay.

22     Q.  This is the deposition notice for today.  Have you

23 seen this notice before?

24     A.  Before today?

25     Q.  Yes.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     A.    No.

2     Q.    What did you do to prepare for today's deposition?

3     A.    Yesterday I met with legal.

4     Q.    Were you provided with topics?

5     A.    Certain topics, yes.

6     Q.    Were you asked to do anything to prepare to respond
7  to those topics?

8     A.    Nothing extra.

9     Q.    And you're saying the only thing you did in
10 preparation was to speak with legal?

11    A.    Correct.

12          MR. ANDING:  Object to form, and all of the work she
13 had done up to that point searching.

14 BY MS. CISNEY:

15    Q.    At this point, you don't remember what you searched
16 for?

17          MR. ANDING:  Object to the form.  Asked and answered.

18          You can answer.

19          THE WITNESS:  What was the question?

20          MR. ANDING:  Do you remember what you searched for?

21          THE WITNESS:  No, I don't recall.

22          MR. ANDING:  Other than what you've told us already?

23          THE WITNESS:  Correct.

24 BY MS. CISNEY:

25    Q.    When you searched for epidemiological information,

ROUGH DRAFT        NOT A CERTIFIED COPY        ROUGH DRAFT

1  did you find any responsive documents?

2      A.  I don't recall.

3      Q.  If you would look at Exhibit 7.

4      A.  Okay.

5      Q.  Have you seen this document before?

6      A.  I don't recall if I have.

7      Q.  Are you aware of whether this document has been
8  produced in another litigation?

9          MR. ANDING:  Objection.  Beyond the scope of what
10 this witness is designated for.

11         You can answer in your individual capacity, but not
12 as a corporate representative.

13         THE WITNESS:  I'm not certain.

14 BY MS. CISNEY:

15     Q.  I can't remember if I asked this:  Did you search for
16 multiple myeloma?

17     A.  Yes.

18     Q.  All right.  Would you have anyway of knowing whether
19 this document came as one of your search results?

20     A.  Yes, I could look for it.

21     Q.  Do you know whether this was one of the documents?

22     A.  I'm not certain.

23         MR. ANDING:  Just let me lodge an objection.  Again,
24 this is a 1984 document.  Beyond the time frame the court's
25 order required.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1  BY MS. CISNEY:

2      Q.  I do have an additional question; which is, do you
3  know if Chevron had any earlier studies prior to 1984 for
4  cancer deaths with lymphatic cancer deaths at any of the
5  Chevron facilities?

6          MR. ANDING:  Object to the form.  She's only here to
7  identify documents that she's located, not whether or not
8  things exist or don't exist.

9  BY MS. CISNEY:

10     Q.  Did you locate any previous studies?

11     A.  I'm not certain.

12     Q.  Are there any details you can tell me about your
13 search for documents?

14         MR. ANDING:  Object to the form.  Overly broad.

15         MS. CISNEY:  Are you directing her not to answer?

16         MR. ANDING:  I simply made an objection.  It's overly
17 broad.  I think you need to tell her the -- if she can
18 answer -- she can answer if she's capable.

19         THE WITNESS:  Can you ask your question again,
20 please?

21 BY MS. CISNEY:

22     Q.  Do you recall any specific details about your search
23 for documents in this case?

24     A.  Not specific details.

25     Q.  Can you tell me anything other than what we had

ROUGH DRAFT         NOT A CERTIFIED COPY         ROUGH DRAFT

1  discussed earlier that you had searched for general terms
2  provided to you by legal?
3       A.   I don't think there's anything else I could add.
4            MS. CISNEY:  Okay.  Then I think we're done.
5            MR. ANDING:  Thank you, Amber.  Thank you.
6            MR. ANDING:  For the completeness of the record, I
7  know you attached your exhibits that are referenced -- your
8  exhibits that were attached to Mike's deposition, but I want
9  to also, again, attach what I marked as Exhibit A to Formoso's
10 deposition, and I want to attach to this one as well.  And
11 Exhibit B I attached to Formoso's, his topics he was
12 designated for.  And then for this one, I'm designating or
13 attaching as Exhibit B the topics for which Valmores is
14 designated for.
15           MS. CISNEY:  Okay.
16           MR. ANDING:  All right.  Anything else, or are we
17 done?
18           MS. CISNEY:  Donna, if you could, as soon as
19 possible, email a draft of the transcripts, I would appreciate
20 it.  Do you have my email address?
21           COURT REPORTER:  Yes, I have what is in the notice.
22           Would you like a copy of the transcript and also a
23 rough draft of the transcript?
24           MR. ANDING:  Yes, I'd better.
25