ROUGH DRAFT              NOT A CERTIFIED COPY              ROUGH DRAFT

1       IMPORTANT INFORMATION!   IMPORTANT INFORMATION!    **Exhibit 3**

2

3          It is understood by all attorneys and/or their staff
using, saving onto a hard computer disk, or receiving a
4 Livenote/Realtime ASCII or e-mailed rough draft transcript
that:

5

        1.  The following is an unedited rough draft
6 transcript.  Various corrections and/or changes my be made
before the final version is complete.  The use of this rough
7 draft transcript is limited by C.C.P. 2025.540 (b).  This
reporter, as well as any affiliated court reporting agency,
8 will not be responsible for any variance of this draft from
the final transcript.

9

        2.  Because of the nature of stenographic outlines,
10 differences WILL exist between the Livenote/Realtime rough
draft copy and the certified transcript prepared by the
11 reporter.  Those differences will include the following, among
others:

12

        A.  Words may change;
13      B.  Page and line numbers may change;
        C.  Punctuation may change; and/or
14      D.  Quotes my change.

15       3.  Providing a Livenote/Realtime ASCII and/or
e-mail or saving Livenote/Realtime onto a computer hard drive
16 will only be provided when a certified copy is purchased and
there will be a charge for the Livenote/Realtime rough
17 transcript in addition to the charge for the certified copy.

18

19 MS. CISNEY:

20      Q.  Your name is Michael Formoso; is that correct?

21      A.  Yes.

22      Q.  Have you ever been deposed before?

23      A.  Yes.

24      Q.  Approximately how many times?

25      A.  I'm sorry, could you repeat that?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1      Q.  Can you hear me, sir?

2      A.  Yeah, I can hear you now.  Can you repeat the

3 question?

4      Q.  Yes.  How many times have you been deposed before?

5      A.  Approximately seven.

6      Q.  Were they always for -- as a Chevron representative?

7      A.  Yes.

8      Q.  Where is your current work address?

9      A.  801 Chadbourne Road in Fairfield, California.

10     Q.  What is your position with Chevron?

11     A.  Information analyst.

12     Q.  How long have you been working in that position?

13     A.  I've been working in that position or with Chevron?

14     Q.  First, how long have you been working in the

15 position, and then we'll ask the other one.

16     A.  I've been working in the position for 14 years.

17     Q.  How long have you been with Chevron?

18     A.  32 years.

19     Q.  What did you do before your current position with

20 Chevron?

21     A.  I was a warehouse man with Chevron, slash, warehouse

22 lead.

23     Q.  And your current job as an information analyst, what

24 does that entail?

25     A.  Right now, mainly doing litigation support.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1    Q.  Anything else?

2    A.  That's the bulk of it right there.

3    Q.  Okay.  And you have been designated as the corporate

4  records custodian for Chevron in this deposition today; is

5  that correct?

6    A.  Yes.

7        MR. ANDING:  With the Clarification -- with the

8  limitations on the correspondence and your email response to

9  Sarah, which I'll attach as Exhibit A, because I think you

10  numbered yours; as well as the topics that Sarah sent that

11  he's been designated, that she sent to you yesterday, which

12  I'll designate as Exhibit B.

13        MS. CISNEY:  Okay.

14    Q.  Mr. Formoso, what have you done to prepare for the

15  deposition today?

16    A.  I reviewed the deposition order with Greg and Sarah

17  over the phone.

18    Q.  Did you do anything else?

19    A.  Prior to today?

20    Q.  Yes.

21    A.  Just the deposition order.

22    Q.  Okay.  All right.  I'd like to start out by taking a

23  look at what is in the notebook -- it should be labeled as

24  Exhibit 1 -- the deposition notice.

25    A.  Okay.

ROUGH DRAFT         NOT A CERTIFIED COPY         ROUGH DRAFT

1      Q.  The notice makes reference to a subpoena for

2 documents that was sent to Chevron earlier.  The same topics

3 of this are listed on Exhibit 1 of the deposition notice.

4 It's also -- Exhibit 2 in the deposition notebook is the

5 subpoena.  Would you take a look at Exhibit 1 for the subpoena

6 on the topics.  It starts on page six?

7          MR. ANDING:  Amber, the one we're looking at behind

8 2 -- Exhibit 1 is page 10 of 11.  Is that not it?

9          MS. CISNEY:  Go to -- well, for now, just stay with

10 Tab 1 on the deposition notebook, and go to page six.

11          MR. ANDING:  Okay.  We got it.

12          THE WITNESS:  Okay.

13 BY MS. CISNEY:

14      Q.  Did you search for any documents in response to this

15 subpoena duces tecum notice?

16      A.  What are you asking me?

17      Q.  I'm asking if you searched for any documents

18 responsive to either of these two notices?

19      A.  You're talking about Exhibit 1?

20      Q.  Exhibit 1.

21      A.  Okay.  What's the other one that you're talking

22 about?

23      Q.  The other one is actually going to be Tab 2 in the

24 notebook, which contains the same subject matter as Exhibit 1.

25          MR. ANDING:  Amber, he -- his hesitation is likely

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 because he is given directions, and so the actual exhibits

2 were something that would not have been put in front of him

3 and told to go find them.  Someone from legal would have given

4 him parameters to search.  So the question, I think -- maybe

5 if you ask if he did searches to try to find things is going

6 to be different than if he looked at this.  So I think that's

7 the hesitation.  He would not have looked at that and tried to

8 find out how to formulate these things.

9 BY MS. CISNEY:

10     Q.  Mr. Formoso, have you ever seen either of these two

11 notices before?

12     A.  Yes.

13     Q.  All right.  The first one, the deposition notice, you

14 mentioned that you talked about that recently.  So you had

15 seen that one, correct?

16     A.  Yes.

17     Q.  And have you seen what is marked on Tab 2, the

18 subpoena duces tecum -- have you seen that before?

19     A.  It's the same thing; yes.

20     Q.  When did you see that?

21     A.  Yesterday.

22     Q.  Okay.  Now, I'm going to start going through the

23 topics to see what you might have looked at.  The first one

24 is:  "Any and all Materials Safety Data Sheet or chemical data

25 sheet for Crude Oil, gasoline, Fuel Oil Toluene, Naphtha, and

ROUGH DRAFT         NOT A CERTIFIED COPY         ROUGH DRAFT

1 Xylene maintained by Chevron from 1982 to 1983."

2         Have you done any searches for documents in that

3 category?

4     A.  Yes.

5     Q.  And what did you search for?

6     A.  The Crude Oil, gasoline, Fuel Oil Toluene, Nap- --

7 however you pronounce that -- and Xylene for that time frame.

8     Q.  Where did you search for those documents?

9     A.  In our records database.

10     Q.  Is that an electronic database?

11     A.  How do you define "electronic"?

12     Q.  Is it on a computer where you can search through it?

13     A.  Correct.

14     Q.  Can you describe what form it's on in the computer?

15     A.  What do you mean by --

16     Q.  Probably specify what I'm looking for.  Is it in the

17 individual files that you're doing a word search, or is it

18 some sort of program that tabulates or keeps track of a brief

19 description of whatever and information about the documents?

20         MR. ANDING:  Amber, if I'm understanding, you're

21 asking whether or not there's some type of summary-type format

22 that he would be searching, or whether it's actual word

23 searches of actual documents scanned in; is that fair?

24         MS. CISNEY:  Yes.

25         THE WITNESS:  You search by words.

ROUGH DRAFT            NOT A CERTIFIED COPY            ROUGH DRAFT

1 BY MS. CISNEY:

2     Q.  Okay.  And when you did your search, did you search

3 for anything other than those specific words like "gasoline,"

4 "Fuel Oil"?

5     A.  No, I searched for those terms.

6     Q.  Did you produce everything that you found in response

7 to those searches?

8         MR. ANDING:  Objection.  Amber, objection just to the

9 extent that he doesn't know what's produced.  Whether or not

10 he provided it to counsel I think would be the more

11 appropriate question for him to be able to answer.  He's not

12 going to know what was actually produced.

13        MS. CISNEY:  Okay.  I would like him to answer that

14 one, if he can.

15        MR. ANDING:  You're asking whether he produced it,

16 meaning, produced it to you; and so I'm just seeking

17 clarification -- do you know whether or not he provided it to

18 legal?

19        MS. CISNEY:  I'm going with whether it's produced in

20 this case.  I realize it would have gone through the attorneys

21 first.

22        MR. ANDING:  He's not going to know that.  He can try

23 to answer, but he -- he's not going to know that.

24        THE WITNESS:  I don't know.

25 BY MS. CISNEY:

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1      Q.  All right.  Do you know what -- how many documents

2  you found for Crude Oil that were either Material Safety Data

3  Sheets or Material Information Bulletins between 1982 and

4  1983?

5      A.  No, I don't.

6      Q.  How about for gasoline?

7      A.  No.

8      Q.  And would that be the same for Fuel Oil Toluene,

9  Naphtha, and Xylene?

10     A.  Correct.

11     Q.  Have you reviewed or looked at the discovery

12  responses that were produced in this case?

13     A.  No.

14     Q.  Do you recall whether you found any Material Safety

15  Data Sheets or Material Information Bulletins for Naphtha?

16     A.  Yes.

17     Q.  And that was for the years 1982 and 1983?

18     A.  I'm not sure what years.  I just found results for

19  that.

20     Q.  What years did you search for?

21     A.  I didn't limit it to a year.

22     Q.  All right.  Did you find results for Xylene?

23     A.  Yes.

24     Q.  Did you find results for Toluene?

25     A.  Yes.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1      Q.  Did you find results for Crude Oil?

2      A.  Before I answer that, are you still talking about

3 MSDSs.

4      Q.  Yes, we're talking about the MSDSs and the

5 Material Information Bulletins.

6      A.  All right.  The Material Information Bulletins and

7 MSDSs to me is two different things.

8      Q.  We can ask about them separately.  Did you find

9 Material Information Bulletins for any of the products?

10          MR. ANDING:  Which number are we on now?

11          MS. CISNEY:  We're still on No. 1.

12          MR. ANDING:  The one I'm look at just asks for

13 Material Safety Data Sheets or chemical data sheets.

14          MS. CISNEY:  I would consider a Material Information

15 Bulletin to be a chemical safety data sheet.

16          MR. ANDING:  Well, I don't know that the witness

17 considers it to be that.  You may want to ask him that.

18 BY MS. CISNEY:

19      Q.  Who determined what search term you would look for?

20      A.  I get guidance from the legal department.

21      Q.  And were you given guidance to limit the search to

22 any particular years?

23          MR. ANDING:  Objection.  Privileged.

24 BY MS. CISNEY:

25      Q.  Can you tell me -- you said you didn't limit it to

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1  years.  Did you only search for Material Data -- Safety Data

2  Sheets?

3      A.  In the -- are you talking in the case of No. 1?

4      Q.  Actually, let's go through it, and consider it a

5  little broader than that.  What categories of documents did

6  you search for other than Material Safety Data Sheets?

7      A.  I'm just given terms from the legal department to

8  search on, and that's what I do.

9      Q.  The database or the data that you were searching in

10  the computer, what type of documents does that contain?

11      A.  It contains business records.

12      Q.  So that would contain the Material Safety Data

13  Sheets, correct?

14      A.  Yes.

15      Q.  And would it contain the Material Information

16  Bulletins?

17      A.  If we have some, yes.

18      Q.  All right.  Do you recall producing any -- or do you

19  recall finding any Material Information Bulletins in your

20  search?

21      A.  No.

22      Q.  Is there anywhere else that information would be

23  stored?

24      A.  That's -- that's -- I'm not the person to answer

25  that.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     Q.  Okay.  Who would be the person to answer that?

2     A.  I don't know.

3          MS. HARRIS:  Would it be helpful to know what is

4  actually stored in the documents that he's maintaining?

5          MS. CISNEY:  Yes, that would be helpful.

6          MS. HARRIS:  Sounds to me you're trying to find out

7  sources of MSDS.  The reason we produced Mr. Formoso is he's

8  the custody of the MSDS that we have archived.  So when you

9  asked him where else they would be, he's not sure what that

10 means.  So that's why he's saying he doesn't know.

11         MS. CISNEY:  That's what I'm trying to find out, if

12 he's aware of whether there's any other place that those

13 documents would be stored.

14         MS. HARRIS:  He would be in charge of the records

15 that are stored.  He's not in charge of figuring out where

16 else they might be.

17 BY MS. CISNEY:

18    Q.  Mr. Formoso, you're given documents, from what your

19 attorney is telling me, that you would store.  Where do you

20 receive those documents from?  What sections of the company?

21    A.  I receive them from any of the operating groups

22 within the company.

23    Q.  What is the company's document retention policy for

24 Material Safety Data Sheets?

25    A.  As far as I know, it's 30 years.

ROUGH DRAFT            NOT A CERTIFIED COPY            ROUGH DRAFT

1     Q.  Did you say three?

2     A.  30, three-zero.

3     Q.  What is the document retention policy for Material

4 Information Bulletins?

5     A.  Be it I'm not familiar with what that is, I can't

6 tell you.

7     Q.  You've never seen a Material Information Bulletin?

8     A.  No, ma'am.

9     Q.  Okay.  If you would look at what was marked by the

10 court reporter -- I think it was Exhibit 13 or Tab 13 in the

11 notebook.

12    A.  Notebook only goes up to tab 11.  I have a 12.

13    Q.  Okay.  Look at 12.  I'm sorry, got the number wrong.

14    A.  Okay.

15    Q.  This is what I'm referring to as a Material

16 Information Bulletin.  Have you ever seen a document like this

17 before?

18    A.  No.

19    Q.  Okay.  Do you recall how far back the documents, as

20 far as your Material Safety Data Sheets, went?  Did they go

21 beyond -- prior to 1982 -- actually, let me rephrase that.

22        Do you recall what the oldest documents you found as

23 far as Material Safety Data Sheets was?

24    A.  No, I do not.

25    Q.  When did you begin searching for documents in this

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 case?

2          MR. ANDING:  Your question is to him individually?

3 You're not asking him if he knows when Chevron started

4 searching for documents in this case, correct?

5          MS. CISNEY:  Actually, I am asking him as the

6 corporate representative, so yes, I'm asking when Chevron

7 began searching for documents.

8          MR. ANDING:  I don't know that he is going to know

9 that.  I'm not sure there's a topic in here that covers that's

10 what he's been designated for.  Objection.  Beyond the scope

11 of the notice, and beyond the scope of the designation as the

12 corporate representative.  You want to ask his individual

13 capacity to get what field of scope he's been involved in, I

14 don't have an objection to that.

15 BY MS. CISNEY:

16     Q.  All right.  Do you recall when you began searching

17 for documents in this case?

18     A.  Sometime in January.

19     Q.  January of this year?

20     A.  January of -- yeah, January of this year.  Sorry, I

21 didn't clarify that.

22          MS. HARRIS:  Last month.

23          THE WITNESS:  Sorry.

24 BY MS. CISNEY:

25     Q.  All right.  If you would go to page three.

ROUGH DRAFT           NOT A CERTIFIED COPY           ROUGH DRAFT

1            MR. ANDING:  Still on Tab 1, Amber?

2            MS. CISNEY:  Yes.

3            MR. ANDING:  Okay.

4            THE WITNESS:  Are you referring to page three of

5 seven?

6 BY MS. CISNEY:

7      Q.  I have three of eight on mine, the first document in

8 the notebook.

9            MR. ANDING:  Yeah, ours is showing three of seven.

10 It's Exhibit A.  Okay.

11            MS. CISNEY:  Yes.

12            THE WITNESS:  Okay.

13 BY MS. CISNEY:

14      Q.  Would you look at Section C where it says, "Knowledge

15 of the efforts extended by Chevron to identify, locate, and

16 produce the documents requested in the accompanying subpoena

17 and those requested in Plaintiff's requests for production of

18 documents or any other discovery request directed to Chevron,

19 USA, individually and as a successor Gulf Oil."

20            MR. ANDING:  That's what -- that's not what your C

21 reads.  Our reads, "Produce person most knowledgeable about

22 following:"  And it says, "Records Custodian."  C, "Knowledge

23 of efforts extended by  Chevron to identify, locate, and

24 produce the documents requested in the accompanying subpoena

25 and those requested in Plaintiff's request for production of

ROUGH DRAFT            NOT A CERTIFIED COPY            ROUGH DRAFT

1 documents or any other discovery requests," and it ends there.

2        MS. CISNEY:  I think there was a more recent subpoena

3 sent when we --

4        MR. ANDING:  There may have been, but --

5        MS. CISNEY:  I don't know.  I don't recall having --

6        MR. ANDING:  We're looking at what you provided to

7 the court reporter.  So if there is, you all attached the

8 wrong one in the book you sent us.

9        MS. CISNEY:  Possible.  I thought we had four of

10 these.

11     Q.  So going with the subject that you have described, do

12 you have any information -- well, first of all, were you

13 designated on this topic?

14     A.  Yes.

15     Q.  Okay.  Do you have any information in response to

16 that?

17     A.  What do you mean by "information"?

18     Q.  What I'm asking is:  Your attorneys have indicated

19 that you do not have information on when searches began for

20 the documents other than your own individual searches.  So do

21 you have information on any other efforts extended by Chevron

22 to search for discovery responses?

23     A.  No.

24     Q.  You haven't talked to you anyone else within Chevron

25 to determine what was done to respond to discovery?

ROUGH DRAFT              NOT A CERTIFIED COPY              ROUGH DRAFT

1        MR. ANDING:  Other than legal?

2        MS. CISNEY:  Other than legal.

3        THE WITNESS:  No, only legal.

4 BY MS. CISNEY:

5    Q.  If you go up to the one before that, Section B,

6 "Knowledge regarding the locations and/or dispositions of all

7 files identified and/or received by Chevron in connection with

8 this case."

9        Do you have any information in response to that

10 request?

11    A.  On the part where it says "regarding the locations,"

12 are you talking about -- are you referring to where the

13 records are located?

14    Q.  Yes, that would include where the records are

15 located, and that would include any records that the company

16 has beyond what -- any specific ones that are just in your

17 department.

18    A.  All I handle is records that are stored in inactive

19 record centers that are sent to us.  These are business

20 records that are sent to us by the deferred operating

21 companies.

22    Q.  I'm sorry, it's difficult to hear over the phone.

23 Did you say "inactive"?

24    A.  If they're considered, quote, inactive, they're not

25 stored on site; they're stored off site.

ROUGH DRAFT        NOT A CERTIFIED COPY        ROUGH DRAFT

1     Q.  Do you know what requirements a document has to meet

2 our situation for it to be considered inactive?

3     A.  It's not -- it's still -- it's still needed for

4 business purposes, but it's not needed on a daily basis.

5     Q.  Okay.  Is there a time limit that is used, or is it

6 just a judgment call on the part of the person providing it?

7     A.  It's a judgment call based on their needs and also

8 what their space limitations are.

9     Q.  Do you know if Chevron has a toxicology department?

10        MR. ANDING:  Objection.  Beyond the scope of what

11 he's being designated for.

12 BY MS. CISNEY:

13     Q.  Is there any sort of document storage, either in

14 other departments such as a toxicology department or health

15 department, of a database of documents?

16        MR. ANDING:  Again, objection.  Beyond the scope of

17 what he's being designated for.

18        If you know in your individual capacity, you can

19 answer, but I'm not going to --

20        MS. CISNEY:  The files identified or review --

21        MR. ANDING:  I understand.  You're not asking what he

22 identified and reviewed; you're asking whether certain thing

23 exist.  I'm not going to allowed him to answer on behalf of

24 the Chevron.  You have shown that you want to misrepresent --

25        MS. CISNEY:  We -- the objection is noted.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1          MR. ANDING:  I agree, Amber, but I'm not going to

2 allow him to answer a question and you come back and say,

3 "Chevron said because he's not designated for Chevron on that

4 topic."

5 BY MS. CISNEY:

6     Q.  If you would look, again, at tab No. 12.

7     A.  Okay.

8     Q.  This document was presented to the Plaintiff and

9 produced in discovery in this case.  I know you have said that

10 you have not seen this type of document before.  Do you know

11 where this type of document would be stored?

12    A.  It could be stored in inactive storage.

13    Q.  You didn't find any documents of this type; is that

14 correct?

15         MR. ANDING:  Object to the form.

16 BY MS. CISNEY:

17    Q.  You had represented earlier that you had not found

18 any Material Information Bulletins, correct?

19         MR. ANDING:  He -- I think he testified he didn't

20 look for any.

21         THE WITNESS:  I did not look for any.

22 BY MS. CISNEY:

23    Q.  Do you recall whether you found any?

24         MR. ANDING:  Objection.  If he didn't look, I'm not

25 sure that he would have found.  Again, Amber, I'm --

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 BY MS. CISNEY:

2     Q.  Do you know where the source of this document is?

3 Where it came from?

4     A.  No, I do not.

5          MS. HARRIS:  This was produced in discovery by

6 someone else.

7          MR. ANDING:  Amber, do you have a Bates number for

8 what this was produced as?

9          MS. CISNEY:  Let's see.  It's hard to read, because

10 it kind of looks like Chevron --

11          MR. ANDING:  I see it now on the bottom left.  I

12 didn't see it earlier.

13          MS. CISNEY:  Okay.  And I think there's a little bit

14 of a mix there.  There's another one later on that I don't see

15 a number on.

16          MR. ANDING:  Okay.  Thank you.

17 BY MS. CISNEY:

18     Q.  Did you search for any benzene air monitoring results

19 for either the Oak Point or the Alliance Refinery?

20     A.  I'm sorry could you repeat that?

21     Q.  Did you search for any benzene air monitoring results

22 for either the Oak Point plant or the Alliance Refinery for

23 1982 and 1983?

24     A.  Yes.

25     Q.  Did you find any?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1      A.  Not that I remember.

2      Q.  What search terms did you use when looking?

3      A.  Search terms that were provided to me by legal.

4      Q.  Can you tell me what they are?

5      A.  In the case of what you just mentioned, the -- you

6 said benzene air monitoring -- and did you say Alliance; is

7 that correct?

8      Q.  Yes.

9      A.  Then I would look -- I would look for records that

10 contain information related to air monitoring and Benzene and

11 Alliance.

12     Q.  Did you also look for it with respect to Oak Point?

13     A.  I would have done the same search with the Benzene

14 air monitoring and attached Oak Point to it.

15     Q.  And if you found any of those, they would have been

16 transmitted to counsel?

17     A.  That is correct.

18     Q.  You may not be the person designated -- I realize we

19 have a little bit of break up of the subject -- but did you

20 search for any documents that concern the health affects of

21 Benzene?

22     A.  I don't remember doing that.

23     Q.  Did you search for any warning signs for Oak Point

24 for the chemicals gasoline, Fuel Oil, Crude Oil, Toluene,

25 Xylene?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1          MR. ANDING:  I'm sorry, the question was for warnings

2 like signs, or warnings, period?

3          MS. CISNEY:  Warning signs.

4          MR. ANDING:  Like signs that were posted?

5          MS. CISNEY:  Yes.

6          MR. ANDING:  Okay.

7          THE WITNESS:  No.

8 BY MS. CISNEY:

9     Q.  Did you search for any safety manual for the Oak

10 Point plant?

11    A.  Yes.

12    Q.  What did you find?

13    A.  I don't remember.  Let me preface this also, so that

14 you understand what I do.  I'm given search terms; I locate

15 those documents; and then whatever I find, those results are

16 forwarded on to legal.  I don't review anything that I find.

17 I just find what's relevant to what they've given me, and I

18 forward that information on to them.

19    Q.  Okay.  Is it sent electronically, or is it printed

20 and then sent?

21          MR. ANDING:  Did you send them physical documents, or

22 do you email them, or some other way provide them to them?

23          THE WITNESS:  Send boxes.

24 BY MS. CISNEY:

25    Q.  Okay.  If you would look at Tab No. 11 -- actually,

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 I'm sorry, that's wrong.  Actually Tab No. 5, I'm sorry.

2 Could you just take a quick look at it, and see if those are

3 documents you have seen in searching for the documents for

4 this case?

5          MR. ANDING:  Amber, I'll let him answer, but I think

6 his previous explanation is what you're looking for, which is,

7 he doesn't review these things.

8          THE WITNESS:  No, I have not.

9 BY MS. CISNEY:

10     Q.  Okay.  Is there any list that you have that

11 identifies those documents that you found responsive to your

12 search term and forwarded to the legal department?

13          MS. HARRIS:  I'm sorry, what was the first part of

14 the question?

15          MR. ANDING;  You're asking if he has some type of

16 summary document that shows what he found, Amber?

17          MS. CISNEY:  Yes.

18          MR. ANDING:  You can say whether you have or not.

19 That's another issue whether it's produced, but do you have

20 such a document?

21          THE WITNESS:  Are you asking in your question do I

22 have something showing what I searched on?

23 BY MS. CISNEY:

24     Q.  I'm asking if you have something that shows the

25 results of your searches.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     A.  Yes.

2     Q.  And has that been produced?

3          MR. ANDING:  Do you mean provided to legal?

4          MS. CISNEY:  At this point, yes.

5          THE WITNESS:  Yes, it was provided to legal.

6          MS. CISNEY:  I'm going to request that be provided to

7 Counsel --

8          MR. ANDING:  And we're --

9          MS. CISNEY:  -- Counsel.

10          MR. ANDING:  And we're going to object and maintain

11 that objection as privileged and also as information that may

12 be irrelevant.  It's within the scope of the attorneys to

13 determine what's responsive and not, and it's also work

14 product in addition to being privileged, but we can deal with

15 that later.  I want that objection clear.

16          MS. CISNEY:  And I understand we're in the conundrum

17 where there's no record of what has been found and what has

18 been produced what -- other than what -- you know, what we

19 actually received.  So we can't tell from the questions that

20 you're not objecting to whether Chevron has actually produced

21 the documents --

22          MR. ANDING:  Well, I mean, that's --

23          MS. CISNEY:  -- which we requested, which frustrates

24 the purpose of this deposition.

25          MR. ANDING:  I understand your position, and it is

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 noted.  Unfortunately, that is, kind of, the nature of

2 litigation and discovery.  You don't always get to know what

3 everything in the entire universe exists is.  You get what is

4 responsive and nonprivileged.  And if it's privileged, you can

5 get a privilege log.  I don't know that -- I don't know what

6 to tell you.

7          MS. CISNEY:  You haven't produced a privileged log,

8 have you?

9          MR. ANDING:  I have not, but you haven't asked for

10 anything physical until today that we considered privileged.

11 BY MS. CISNEY:

12     Q.  Mr. Formoso, did you search for contracts for either

13 the Alliance refinery -- well, start with that one.  Did you

14 search for Alliance Refinery -- did you search for documents

15 or contracts between the Alliance Refinery and Oil Mop?

16     A.  Yes.

17     Q.  Did you find any?

18     A.  Not that I remember.

19     Q.  Did you search for contracts between the Oak Point

20 plant and Oil Mop?

21     A.  Yes, I did.

22     Q.  Did you find any?

23     A.  Not that I remember.

24     Q.  I would like you to look at Tab 6.  Have you seen

25 this document or a similar document before?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     A.  No.

2     Q.  So you can't identify where this document that was

3 produced to Plaintiff came from?

4     A.  No, not -- no.

5     Q.  Have you ever seen a database for contracts from Oak

6 Point?

7          MS. HARRIS:  Explain the general concept.

8          THE WITNESS:  Okay.  Let me back up here.  The

9 database that I search -- and I think this will help you --

10 the database I search houses all records that are stored in

11 inactive facilities like Oak Point, like Concord, like San

12 Ramon, like -- that's what it houses, any records that have

13 been sent to one of our facilities.  From that, that's what's

14 searchable in types.

15 BY MS. CISNEY:

16     Q.  Okay.  If the facility previously kept up a database

17 program and switched out or upgraded, what would happen to the

18 old database?  Do you know?

19     A.  I have no idea.  I don't deal with that.

20     Q.  So you only archive what were originally paper

21 documents; is that correct?

22     A.  Correct.

23     Q.  Are you aware of any archive for electronic documents

24 or databases from facilities like Oak Point or Alliance?

25     A.  Not that I'm aware of.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     Q.  On page three, I'd like you to look at number -- our

2  subject D.

3     A.  Are we going back to the beginning?

4          MR. ANDING:  Tab 1, Amber?

5          MS. CISNEY:  Yes, Tab 1.

6          MR. ANDING:  Page three.  Just a second.

7          THE WITNESS:  Okay.

8  BY MS. CISNEY:

9     Q.  We will only be here probably briefly.  If you would

10  look at it, it talks about Chevron's efforts to identify,

11  locate and the information requested for admissions directed

12  to Chevron.

13     A.  That's D.

14     Q.  Yes, that's subject D.

15          (Ms. Harris left the proceedings.)

16          THE WITNESS:  All I can attest to is what I was asked

17  to look for.

18  BY MS. CISNEY:

19     Q.  Okay.  Now, I want you to go to Tab 10.  These are

20  documents that Plaintiff provided -- or I'm sorry, 11 -- and

21  I'd ask for Autointoxication.

22     A.  Autointoxication as in?

23     Q.  We ask if they were Chevron documents in response --

24  or they were accurate copies of documents in Chevron's files,

25  subject to a number of objections, but did you participate in

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 searching for these documents?

2          MR. ANDING:  Amber, I'm going to object simply

3 because I think we admitted they're authentic.  I think it's

4 irrelevant and getting into, you know, harassing, and I'm not

5 sure what your purpose is here, but --

6          MS. CISNEY:  My purpose is to --

7          MR. ANDING:  I'm not finished.  To the extent he can

8 answer it, I will allow him.  But we've admitted they're

9 authentic Chevron documents.

10          So Mr. Formoso, if you can answer the question

11 whether or not you searched for documents that they provided

12 and had anything to do with the Autointoxication of those

13 documents.

14          THE WITNESS:  I could have searched for these

15 documents.  Based on, you know, terms that were provided to me

16 to search for, it could have turned up these documents.  I

17 mean, that's as much as I can attest to.

18 BY MS. CISNEY:

19     Q.  Okay.  If you look at the bottom right-hand corner of

20 the first document, there are several identification numbers.

21 Do you see those?

22     A.  Are you talking about the 6040, slash, 13407?

23     Q.  I'm referring -- there's an HF 010999 and SIM

24 0001498.

25     A.  Correct.

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     Q.  Are you familiar with the purpose of those numbers?

2     A.  No, I am not.

3     Q.  Do any of the documents you routinely access have

4 numbers identifying like that?  Typically they're identified

5 as Bates numbers in court.

6     A.  I couldn't tell you that.

7     Q.  Do you review any of the numbers or identify the

8 documents you send before you send them to the legal

9 department?

10    A.  No, I do not.

11    Q.  Did they ever send back to you documents that have

12 been numbered like this?

13    A.  Not that I'm aware of.

14    Q.  Have you ever -- you've never been asked to search

15 for a document with a Bates number like this, correct, at

16 least not in this case?

17    A.  Not that I remember.

18    Q.  Would you go to subject -- back on Tab 1, page four.

19    A.  Okay.

20    Q.  If you would go to topic F, subpart one.

21    A.  Okay.

22    Q.  Actually, let's skip one.  I think we already covered

23 that.  Subject two -- and this is maybe a little bit

24 repetitive.  But it would asking, did you search for any other

25 information for that 1982 and 1983 period for the chemicals

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 Crude Oils, gasoline, Fuel Oils, Toluene, Naphtha, and Xylene?

2     A.  All I searched for was those terms, Crude Oil,

3 gasoline, Fuel Oil, Toluene, and the other two.  That's all I

4 searched for.

5     Q.  And topic three, did you search for any benzene

6 testing data for any of those chemicals identified?

7     A.  Are you referring to any benzene testing data or --

8     MS. WEISSMAN:  Hold on, Mike.  Sorry.  This is Sarah

9 Weissman.  Amber, that topic was designated for our second

10 records Custodian, Elina, and that was provided to you

11 yesterday.  So he's not prepared to answer that question.

12    MS. CISNEY:  I thought I had marked the ones that

13 were for our other witness, and I apologize, and that's one,

14 three --

15    MS. WEISSMAN:  One, three, six, 20.  So just to be

16 clear, he's not going to talk about that.

17 BY MS. CISNEY:

18    Q.  Going to No. 7.

19    A.  Okay.

20    Q.  Health and safety documents concerning effects of

21 gasoline, Crude Oil, Fuel Oil, Naphtha, Toluene, and Xylene

22 produced or used at Oak Point or Alliance Refinery in the --

23 from 1982 to 1983.

24    A.  You mean No. 8?

25    Q.  Our numbers may be different.

1      A.  Because my seven says, "Chevron purchasing records."

2      Q.  No, that's why the numbers are difficult --

3 different, because we deleted that one.  So the one below

4 that.

5      A.  Once again, I searched on the terms "Crude Oil,"

6 "Fuel Oil," the different names you have here.  I did a

7 general search on those terms.

8      Q.  Can you describe the categories of documents that you

9 found in response?

10      A.  No, I cannot.

11      Q.  Can you describe the categories of documents that are

12 in the database you're searching?

13      A.  The categories -- what type of documents?

14      Q.  Yes.

15      A.  It could range from paid invoices, to contracts, to

16 real estate records.  I mean, anything -- any records that,

17 you know, are created in the course of business.

18      Q.  I asked you about searching for health and safety

19 manuals previously.  I know I asked you about Oak Point.  Did

20 you search for safety manuals for Alliance?

21      A.  Yes, I did.

22      Q.  Did you find any?

23      A.  Not that I remember.

24      Q.  Do you know if any efforts were made to search at the

25 Oak Point Refinery for safety manuals?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1     A.  I would not be aware of that.

2     Q.  And would that be the same situation with the

3 Alliance Refinery?

4     A.  Correct.

5     Q.  Is there anyone else that would know whether there

6 are Material Safety Data Sheets for the Fuel Oil, Toluene,

7 Naphtha, and Xylene from 1982 to 1983 maintained anywhere at

8 Chevron?

9     A.  Not that I'm aware of.

10     Q.  You mentioned that the database contained invoices.

11 Did you specifically identify Oil Mop as a term that you

12 searched for?

13     A.  Yes, I searched for Oil Mop.

14     Q.  Do you recall whether you found any invoices for Oil

15 Mop?

16     A.  No, I do not.

17     Q.  Did you search for any facility sign-in sheet for the

18 Oak Point plant?

19     A.  Facility sign-in sheets -- are you talking --

20 referring to visitor logs?

21     Q.  Visitor logs or security logs, yes.

22     A.  Yes.

23     Q.  Did you find any?

24     A.  Not that I remember.

25     Q.  Did you search for any sign-in sheets or security

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 logs for Alliance?  I believe I asked you about Oak Point,

2 correct?

3      A.  That's correct; and yes, I did search for that; and

4 no, I don't remember if I found any.

5      Q.  Do you know where -- what the document retention

6 policy is for the sign-in sheets or security sheets for the

7 facility?

8      A.  Off the top of my head, five years.

9      Q.  Is there a written document retention policy?

10      A.  What you do mean by "written document policy"?

11      Q.  Is there a policy that's written somewhere within

12 Chevron that says this category of documents keep for a

13 certain number of years, and another category to keep for five

14 years, and MSDS for 30 years, that sort of thing.

15      A.  Yes, we do have a retention policy.

16      Q.  Have you seen that retention policy?

17      A.  Yes.

18      Q.  Have you looked at it recently?

19      A.  Yes.

20      Q.  Did you look for facility diagrams or aerial

21 photographs for the Alliance Refinery from 1982 to 1983?

22      A.  Yes.

23      Q.  Did you find any?

24      A.  Not that I remember.

25      Q.  How about for Oak Point?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1      A.  Yes.

2      Q.  And did you find any?

3      A.  Not that I remember.

4      Q.  What is the document retention policy for those types

5  of documents?

6      A.  You're referring to, like, drawings -- drawings of

7  the facility, that type of thing, like, blueprints, and

8  that -- is that what you're referring to?

9      Q.  Yes.

10      A.  Anywhere from five to ten years, depending on the

11  specific type of document.

12      Q.  Did you search for tank logs for the Alliance

13  Refinery?

14      A.  Yes.

15      Q.  And did you find any?

16      A.  Not that I remember.

17      Q.  Did you search for tank logs for the Oak Point

18  refinery?

19      A.  Yes.

20      Q.  Did you find any?

21      A.  Not that I remember.

22      Q.  If you found any, would they have been produced to

23  the legal department?

24      A.  Yes.

25      Q.  For safety training data, from 1982 to 1983, for

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1 contract workers at the Alliance refinery --

2      A.  Could you repeat that?

3      Q.  For the time period from 1982 to 1983, did you look

4 for records of safety training for contract employees at

5 Alliance?

6      A.  Yes.

7      Q.  Did you find any records?

8      A.  Not that I remember.

9      Q.  Did you search for those training records for Oak

10 Point during that time period?

11     A.  Yes.

12     Q.  Did you find any?

13     A.  Not that I remember.

14     Q.  When you made those searches, how did you search?

15 What search terms did you use?

16     A.  Safety and training and then the refinery, and the

17 refinery as in Alliance and Oak Point.

18     Q.  Okay.  Would you take a look at Tab 7.

19     A.  Okay.

20     Q.  This is a Chevron study that was produced in another

21 case.  Would this be something that was maintained in the

22 database that you searched?

23     A.  Yes, quite possibly.

24     Q.  When you were searching for information in your

25 database, did you search for multiple myeloma?

ROUGH DRAFT          NOT A CERTIFIED COPY          ROUGH DRAFT

1    A.  Yes.

2    Q.  What did you find in response?

3         MR. ANDING:  Amber, let me lodge an objection.  I

4 notice this document is dated 1984.  Pursuant to the Court's

5 order, the production was limited through 1983.

6         But go ahead, if you can answer the question.

7         THE WITNESS:  I searched for multiple myeloma.  I

8 don't remember what I found.  If I did find any information,

9 it was passed on to legal.

10 BY MS. CISNEY:

11    Q.  Can you remember what -- whether you found anything

12 at all?

13    A.  I can't remember.

14    Q.  Were you asked to review what you had searched or

15 what you had done in preparation for this deposition?

16    A.  No, ma'am.

17    Q.  If you would look at Exhibit 8 -- tab 8, I'm sorry.

18    A.  Okay.

19    Q.  On page -- well, let's start -- are you familiar with

20 an individual named Patrick Beatty?

21    A.  No.

22    Q.  This is his deposition in another case as the Chevron

23 corporate representative.  If you look at page 32 --

24    A.  Okay.

25    Q.  -- line 21 -- it's actually, 19 through about 21 --

ROUGH DRAFT           NOT A CERTIFIED COPY           ROUGH DRAFT

1     A.  Got you.

2     Q.  -- he talks about a toxicology library.

3     A.  Okay.

4     Q.  Do you know where that library would be?

5     A.  No.

6     Q.  Would that be included in the documents that you

7 maintain?

8     A.  Information from the toxicology library?

9     Q.  Yes.

10     A.  Only if they send it to us.

11     Q.  On page 33 --

12     A.  Okay.

13     Q.  -- let's see -- lines 17 through 20 --

14     A.  Okay.

15     Q.  -- they discuss MSDS files.

16     A.  Yes.

17     Q.  Do you know where those files are located?

18          MR. ANDING:  Let me lodge an objection.  I don't have

19 a problem with the questions.  I have a problem with

20 referencing this deposition, which I don't know as a topic on

21 your deposition notice for him to talk about.  I don't have a

22 problem with answering the substance of your questions, but

23 referencing the deposition is inappropriate and beyond the

24 scope of what this witness is designated.  He can't comment on

25 what other people have testified to, but he can -- you know, I

ROUGH DRAFT            NOT A CERTIFIED COPY            ROUGH DRAFT

1 don't have a problem with letting him answer the substance of

2 what your actual question is.

3 BY MS. CISNEY:

4      Q.  Okay.  So subject to that, can you tell me where the

5 MSDS files are located?

6      A.  All I can tell you is the MSDS files that are in our

7 facility.

8      Q.  You don't know how complete -- let me rephrase it.

9          Do you know how complete those files are?

10      A.  No, I do not.  Let me back up.  What do you mean by

11 "complete"?

12      Q.  All MSDS sheets for the past 30 years that have been

13 produced or used at Chevron contained in your database.

14      A.  I couldn't tell you that.

15      Q.  Okay.  The database you searched, do you know if it

16 contains any literature or journal articles concerning health

17 and safety?

18      A.  It very well could.

19      Q.  And if it did, they would have shown up in your

20 search responsive to the search terms you asked for; is that

21 correct?

22      A.  That's correct.

23          MS. CISNEY:  All right.  I think that is all the

24 questions I have for this witness.

25          MR. ANDING:  Okay.

ROUGH DRAFT                NOT A CERTIFIED COPY              ROUGH DRAFT

 1          COURT REPORTER:  Would you like a copy of the

 2  transcript?

 3          MR. ANDING:  Yeah.  You don't have to ask me on the

 4  record, do you?  Yes, I'd like a copy.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25